IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

LISA CAMPBELL                                                      PLAINTIFF

         v.              Civil No. 06-4023

MICHAEL J. ASTRUE[1], COMMISSIONER
OF SOCIAL SECURITY ADMINISTRATION                                 DEFENDANT

## J U D G M E N T

Now on this 20th day of March, 2007, comes on for consideration plaintiff Lisa Campbell's Complaint for judicial review of the decision of the Commissioner of the Social Security Administration, denying her a period of disability and disability benefits under the Social Security Act.

1.   The Court's role upon review of the decision of a Social Security Administrative Law Judge ("ALJ") is to determine whether the decision is supported by substantial evidence on the record as a whole.  **Ramirez v. Barnhart, 292 F.3d 576 (8th Cir. 2002).** Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support a conclusion. *Id.* The Court must consider not only the evidence supporting the ALJ's decision, but also that which fairly detracts from it, and must affirm if the record - viewed as a whole - contains substantial evidence to support the decision. *Id.* The Court may not reverse simply because the record also contains substantial

---

[1]Michael J. Astrue became the Social Security Commissioner on February 12, 2007. Pursuant to F.R.C.P. 25(d)(1), he has been substituted for Jo Anne B. Barnhart as the defendant in this suit.

evidence that would have supported a contrary decision. **Haley v. Massanari, 258 F.3d 742 (8th Cir. 2001).**

The burden rests on the claimant to prove that she has a disability, mental or physical, that has lasted - or can be expected to last - at least one year and that prevents her from engaging in any substantial gainful activity. **Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001).**

2.   Campbell filed the application for benefits now under consideration on July 8, 2003, alleging a disability onset date of May 31, 2003.  She alleged the following disabling conditions: chemical allergies, high blood pressure, and back and neck problems.

At the time of her hearing before the Administrative Law Judge ("ALJ") on March 31, 2005, Campbell was 46 years old.  She had a high school education, and past relevant work experience as a revenue agent for the State of Arkansas.

On September 16, 2005, the ALJ rendered an unfavorable decision.  He found that Campbell had significant limitations in her capacity for heavy lifting and carrying and for prolonged walking and standing, but did not have an impairment that met or equaled any impairment or combination of impairments  listed in Appendix 1 to Subpart P, Regulations No. 4.

The ALJ did not fully credit either Campbell's testimony or that of her treating physician Dr. Keith Mitchell.  He discredited

Campbell because the objective medical evidence and her daily activities were not consistent with the level of pain she alleged. He discredited Dr. Mitchell because his residual functional capacity ("RFC") evaluation "contrasts sharply with the other evidence of record" and appeared to be based on taking "the claimant's subjective allegations at face value."

The ALJ found that Campbell had the residual functional capacity for sedentary work, but could not return to her past relevant work. He relied upon the testimony of a Vocational Expert to the effect that there were significant numbers of jobs that Campbell could perform, such as assembly, data entry, and cashier, available in the regional and national economies. He thus concluded that Campbell was not disabled.

On March 17, 2006, the Appeals Council declined to review the ALJ's decision, making that decision the Commissioner's final decision. This appeal followed.

3.   Although she is represented by counsel, Campbell did not file a brief in this matter, and her Complaint makes only the generalized allegations that the ALJ erred in finding that she was not disabled and applied an erroneous standard of law. The Court has reviewed the record in light of these allegations, and finds the following factual scenario:

\*      The medical records commence with one dated January 4, 2002, when Campbell saw her family doctor, Dr. Mitchell,

for post-operative pain.  The medical records relating to the surgery are not in the record, but context indicates that this operation was on her neck and/or back.  Campbell's blood pressure at this visit was 142/86.  Prescriptions for Celebrex[2] and Ambien[3] were refilled.

* On March 18, 2002, Campbell saw Dr. Mitchell with complaints of ear, back and neck pain.  Her blood pressure was 138/90.  Anti-inflammatory treatment was continued.

* On May 23, 2002, Campbell saw Dr. Mitchell with complaints of continued neck and back pain. Dr. Mitchell noted that "she feels like she is becoming disabled and is not able to work a full day."  Campbell's blood pressure was 140/98.  He assessed her with cervical degenerative disc disease and back pain, scheduled physical therapy, and made an appointment with Dr. Mason for followup on her surgery.

* On June 7, 2002, Campbell had an MRI of the lumbar spine, which showed "[s]mall to moderate recurrent right lateral disc extrusion at L4-5 with associated moderate scarring. This compromises the right L5 nerve root in the lateral

---

[2]A non-steroidal anti-inflammatory pain medication useful in treating joint pain. Physicians' Desk Reference, 2007 Ed.

[3]A hypnotic agent used to treat insomnia.  Physicians' Desk Reference, 2007 Ed.

-4-

recess."

* On June 26, 2002, Campbell saw Dr. Mitchell for a checkup, and to have lab work done. Her blood pressure was 130/80. Lumbar disc disease, low back pain, and hypercholesterolemia were assessed. Dr. Mitchell refilled prescriptions for Darvocet[4] and Ambien.

* On August 6, 2002, Campbell saw Dr. Mitchell complaining of continuing to have "a lot of pain in her legs." She had seen Dr. Mason, who sent her for orthopedic evaluation, and she had been told to go back to see Dr. Mason, who reportedly was "reluctant to do surgery." Her blood pressure was 136/76. Dr. Mitchell's assessment was "lumbar back pain with degenerative changes of the disc," and he refilled her prescription for Darvocet "until she has a chance to go back and see Dr. Mason."

* On September 12, 2002, Campbell saw Dr. Mitchell "to discuss her appointments with Dr. Mason," which she had not kept. She was still having a lot of pain, and thought she was going to have to see Dr. Mason. Her blood pressure was 128/90. Dr. Mitchell assessed cervical disc disease, depression, and post-menopausal syndrome, and

---

[4]The active ingredient of Darvocet is propoxyphene, a narcotic pain reliever, indicated in the treatment of mild to moderate pain.  Physicians' Desk Reference, 1995 Ed.

placed her on Paxil[5] and continued her hormone
medication.

* On September 18, 2002, Campbell saw Dr. Mason, "to
  discuss her options for treatment for her right hip
  pain." He recommended conservative treatment.

* On December 30, 2002, Campbell saw Dr. Mitchell for an
  upper respiratory infection. Her blood pressure on that
  visit was 170/90.

* On January 7, 2003, Campbell saw Dr. Mitchell for her
  high blood pressure, which was 160/90 at that visit. He
  diagnosed hypertension, osteoarthritis, depression and
  chronic back pain, and discussed Campbell's
  "fibromyalgia[6] type symptoms." Her medications at that
  time included Vioxx, Estratest, Lipitor, Ambien,
  Darvocet, and Paxil. Lipitor was discontinued, Paxil
  increased, and Accupril[7] added.

* On January 17, 2003, Dr. Mitchell recorded Campbell's
  blood pressure as 140/90.

* On January 24, 2003, Campbell saw Dr. Mitchell for blood
  pressure that "continues to be very elevated, even at

---

[5]An oral psychotropic drug used in the treatment of major depressive disorder, panic disorder, social anxiety disorder, and pre-menstrual dysphoric disorder. Physicians' Desk Reference, 2007 Ed.

[6]"A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown." Stedman's Medical Dictionary, 28th Ed.

[7]An anti-hypertensive with side effects known to include dizziness and fatigue.

home at times." Her blood pressure was 156/102 at that
time.  Dosage of Accupril was increased.

*   On February 11, 2003, Campbell saw Dr. Mitchell for a
    blood pressure check.  She told Dr. Mitchell that her
    blood pressure "continues to run high at home as well as
    in the office," and it was recorded as 150/70 that day.
    Accupril dosage was adjusted this date.

*   On February 21, 2003, Campbell saw Dr. Mitchell for
    complaints of elevated blood pressure.  Her blood
    pressure was recorded as 150/110 at that visit. Benicar[8]
    was added to her drug regimen.

*   On March 6, 2003, Dr. Mitchell recorded Campbell's blood
    pressure as 144/94.

*   On May 1, 2003, Dr. Mitchell recorded Campbell's blood
    pressure as 130/86, and noted "some tenderness
    subjectively on her left side." He assessed her with
    hypertension and cervical disc disease, and referred her
    to Dr. Mason "for evaluation of her neck and her hip to
    see if it is neurological."

*   On May 8, 2003, Campbell had a complete physical
    examination by Dr. Mitchell.  She told Dr. Mitchell that
    her blood pressure had "been bouncing up and down," and
    she had elevated cholesterol and triglycerides, but had

---

[8]An anti-hypertensive agent.  Physicians' Desk Reference, 2007 Ed.

not been taking her medications.  Dr. Mitchell recorded Campbell's blood pressure as 130/86.  He assessed her with hypertension, hypercholesterolemia, postmenopausal syndrome, hypothyroidism, and depression.

* On May 23, 2003, Dr. Mitchell recorded Campbell's blood pressure as 130/98.

* On May 30, 2003, Dr. Mitchell recorded Campbell's blood pressure as 170/100, and assessed her with "uncontrolled hypertension."   He referred her to Dr. Fine for evaluation and treatment.

* May 31, 2003, was Campbell's last day to work.

* On June 16, 2003, Dr. Mitchell noted that Campbell was having "some slight chest pain and getting real short of breath, mostly when she walks" and that "her blood pressure has been very hard to control."  It was 150/92 on this visit.  Dr. Mitchell referred Campbell to Dr. Lee for a treadmill stress test.

* On June 26, 2003, Campbell saw Dr. Mitchell.  Her blood pressure was 130/80.  She had an appointment scheduled with Dr. Mason for July 9, and Dr. Mitchell prescribed Darvocet and Ambien until that appointment.   His assessment was lumbar disc disease, low back pain, and hypercholesterolemia.

* On July 1, 2003, Campbell saw Dr. Robert Spray,

Psychologist, at the behest of her attorney.  Campbell told Dr. Spray that she was unable to work "due to severe back and neck problems resulting in uncontrollable high blood pressure and shortness of breath."  She reported pain increasing "with walking, sitting, standing, or any type of physical exertion," high blood pressure, a "pinched nerve in her left shoulder resulting in some numbness in her hands and arms," depression, weight gain of 60-80 pounds over five years, and poor sleep.  Dr. Spray diagnosed Campbell with dysthymia.[9]

* On July 7, 2003, Campbell saw Dr. Allen Lee for her chest pain.  Dr. Lee recorded Campbell's blood pressure as 140/80, and noted that he had "multiple risk factors for coronary artery disease which include hypertension, hyperlipidemia, a strong family history of coronary artery disease, cigarette smoking, and obesity."  A resting electrocardiogram was abnormal, showing "a sinus rhythm and poor R-wave progression."  He sent Campbell for nuclear stress testing.

* In an undated Disability Report (which the Court believes to have been filled out close to the time Campbell

---

[9]"A chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness."  Stedman's Medical Dictionary, 28th Ed.

applied for benefits on July 8, 2003), Campbell stated
that she had pain in her lower back, right hip, and right
leg; was unable to sit or stand for any length of time
or to work at her computer without her hands and arms
becoming numb; had uncontrollable high blood pressure;
and had severe chemical allergies. She had worked at the
Sevier County Revenue Office since 1977, but stopped work
on May 31, 2003, because of inability to tolerate the
pain. She indicated that she was taking Clonidine[10],
Benicar[11], and Methyldopa[12] daily for her blood pressure,
and that these medications caused her extreme weakness.
She was taking Vioxx and Propoxy/Acetominophen for pain,
Paxil CR for depression, and Ambien[13] for rest. She was
also taking Synthroid[14] for low thyroid, Lipitor[15] for
high cholesterol, Estratest[16] for hormone replacement,

---

[10]Known side effects of this blood pressure lowering agent include weakness, fatigue, nervousness and agitation, depression, weight gain, and muscle or joint pain. Physicians' Desk Reference, 2007 Ed.

[11]Another anti-hypertensive medication. Physicians' Desk Reference, 2007 Ed.

[12]Known side effects of this anti-hypertensive include weight gain, decreased mental acuity, weakness, depression, joint pain, and muscle pain. Physicians' Desk Reference, 2007 Ed.

[13]Side effects may include depression, joint pain, and muscle pain. Physician's Desk Reference, 2007 Ed.

[14]Side effects may include fatigue, nervousness, anxiety, irritability, emotional lability, insomnia, and muscle weakness. Physicians' Desk Reference, 2007 Ed.

[15]Arthritis is a known side effect of Lipitor usage, although its incidence is small. Physicians' Desk Reference, 2007 Ed.

[16]Side effects include depression, nervousness, mood disturbances, irritability, and weight increase. Physicians' Desk Reference, 2007 Ed.

-10-

and carrying an Epi-pen in case of anaphylactic shock.

* In an undated Disability Supplemental Interview Outline, (which the Court also believes was filled out in July, 2003) Campbell indicated that she could do laundry, wash dishes, change sheets, iron, vacuum, and sweep, although doing so caused her pain.  She could also shop for groceries and clothes, prepare meals, drive, watch television and listen to the radio.  She said that she could not walk for errands or exercise because it caused pain in her back, hip, and right leg and made her short of breath.  She said she could not sit or stand for any period of time, and that her hands and arms stayed numb from working on the computers (presumably the computers at work).  She said she had fatigue, necessitating a two hour nap each day, and that she had pain in her lower back, right hip and leg, left shoulder, neck and both arms that "never stops," was helped by rest, and was made worse by standing, sitting, walking, lifting, laying down, or doing any type of work.  She listed the same medications as on the previous Disability Report.  She stated that she did not "want to do anything, see anyone or try to go anywhere.  I'm in pain and depressed."

* On July 14, 2003, Dr. Lee recorded Campbell's blood pressure as 140/82.  He noted that her nuclear stress

testing "shows a bit or reverse wash out but really this looks like she has good perfusion with exercise."  He considered her stable, and asked her to return for recheck in three months.

*   On July 29, 2003, Campbell saw Dr. Fine for her blood pressure problems.  He recorded her blood pressure as 134/78 and then, on recheck, 116/66 on the right and 120/70 on the left.

*   On August 4, 2003, Campbell had a renal scan related to her hypertension.  The scan was read as normal.  A letter from Dr. Fine to Dr. Mitchell this date notes the following problems:  20-year history of hypertension; history of degenerative disc disease; high dose Vioxx therapy plus Darvocet;  history  of  hypothyroidism, hyperlipedemia, anxiety and depression; obesity; and smoking.  He noted Grade I hypertensive changes of the fundi, and decreased pulses distally.  Dr. Fine believed that  "her  hypertension  is  likely  multifactorial exacerbated by both her ongoing tobacco abuse, high dose non-steroidal therapy and her obesity," but wanted to rule out "a secondary renovascular lesion."

*   On August 19, 2003, Campbell saw Dr. Mitchell for some moles on her leg and medication refills.  She told Dr. Mitchell she was "feeling better."  Her blood pressure

was 154/94, and the assessment was hypertension, hypercholesterolemia, and nevi. Dr. Mitchell refilled prescriptions for Benicar, Paxil, Ambien, and Darvocet.

* On September 9, 2003, Dr. Fine recorded Campbell's blood pressure as 132/84 and then 148/84 on recheck, and noted that she complained of back pain. He noted that her blood pressure was under better control, that she believed its fluctuation was related to pain, and that she had retired. She was "still smoking A[gainst] M[edical] [A]dvice."

* On September 16, 2003, Campbell saw Dr. Mitchell. She told him she had been doing "very well," and wanted her prescriptions renewed so they were all refillable on the same date. Her blood pressure was 146/80. The assessment was hypertension, depression, hypercholesterolemia, and myalgia. Prescriptions were refilled for Lipitor, Paxil, and Estratest.

* On October 7, 2003, Dr. Michael Jameson performed a mental status examination of Campbell at the request of the Social Security Administration. Dr. Jameson noted "apparent discomfort sitting through the exam, but "no physical problems or limitations." He found no evidence of mental disease or defect, or of exaggeration or malingering.

-13-

\* On October 14, 2003, Campbell saw Dr. Lee. He recorded her blood pressure as 120/70, and noted that she "really is doing pretty well," and "I see no problems with her. I will check her in six months."

\* On October 24, 2003, Dr. Michael Young conducted a General Physical Examination of Campbell at the request of the Social Security Administration. At that time Campbell's blood pressure was 116/64. The examiner noted some limitation in her cervical range of motion, but the report is not particularly useful for purposes of determining disability. All the examiner indicated, in response to the inquiry about limitations and their severity, was "Lisa was able to dress and undress herself. She was able to get on and off the exam table without assistance."

\* On October 28, 2003, Campbell saw Dr. Weems for problems with her right knee, which had "popped" or "snapped" the preceding week. In the Orthopedic History taken at the time of that exam, Campbell noted that her high blood pressure "is currently controlled by medication," but that she had numbness and tingling in her hands, and arthritis in her neck and back. Dr. Weems diagnosed "arthritic right knee," and injected the knee with Lidocaine and Kenalog. He directed Campbell to return

-14-

in six weeks.

* On November 4, 2003, Dr. Steve Owens completed a Physical
Residual Functional Capacity Assessment based on
Campbell's records, without benefit of a medical source
statement.  Dr. Owens indicated that Campbell could
occasionally lift 20 pounds; could frequently lift or
carry 10 pounds; could sit, stand or walk six hours in
an 8-hour workday; and could perform unlimited pushing
and pulling operations of hand or foot controls.  No
other limitations were noted.

* On December 2, 2003, Campbell saw Dr. Fine.  He recorded
her blood pressure as 122/74, and 118/68 on recheck.

* On December 5, 2003, Campbell saw Dr. Mitchell, who
recorded her blood pressure as 152/92.  Campbell told Dr.
Mitchell she had been doing "very well."  He assessed
osteoarthritis and degenerative disc disease.  Dr.
Mitchell completed a Medical Source Statement of Ability
to do Work-Related Activities (Physical) during the
visit.  He indicated that Campbell could sit for 15
minutes before moving about, and could sit for five hours
in an 8-hour workday.  She could stand for 15 minutes
before needing to change postures, and could stand for
a total of four hours in an 8-hour workday.  She could
walk less than 15 minutes continuously, and could walk

-15-

only two hours in an 8-hour workday. He indicated that Campbell's maximum combined walking and standing capacity in an 8-hour day would be five hours. He indicated that Campbell could lift and carry 20 pounds occasionally and 10 pounds frequently. These restrictions, in Dr. Mitchell's opinion, were supported by MRI results showing disk herniation, high blood pressure, and "muscle spasms - requiring treatment 2-5X per month." Dr. Mitchell also indicated that Campbell could not squat, crawl or kneel, and only occasionally bend, climb, reach overhead, stoop or crouch. He noted - as objective signs of pain - redness, joint deformity, and muscle spasm, and rated the pain as "moderate (could be tolerated but would cause marked handicap in the performance of the activity precipitating the pain)." He indicated that Campbell would sometimes need unscheduled breaks in an 8-hour workday; that her impairments would be likely to produce "good days" and "bad days," and that she could be expected to be absent more than four days a month because of those impairments.

* On January 5, 2004, Dr. Mitchell recorded Campbell's blood pressure as 120/80. She had complaints of knee pain, and said that Dr. Weems had told her "not to ever walk on her leg again and there is nothing he can do

-16-

about it."  She told Dr. Mitchell she "can't live this way and wants to know if somebody else can do this." Dr. Mitchell made her an appointment with Dr. David Gilliam.

* On January 12, 2004, Campbell saw Dr. Gilliam.  He took a history of progressive knee problems, with "severe, progressive pain since November.  She had a pop in the knee at that time and has had a sensation of instability since that time."

* On January 16, 2004, Campbell saw Dr. Mitchell about her knee pain, wanting a second opinion.  Her blood pressure at that time was 130/82.  Dr. Mitchell assessed degenerative joint disease with knee pain, noted the bone-on-bone condition and arthritic spurs shown on the MRI, and told Campbell that he was "not real sure if they would be willing to operate with that much damage and it may cause more problems than benefits."

* On January 23, 2004, Campbell again saw Dr. Gilliam.  He assessed post-traumatic osteoarthritis, meniscus tear, and loose body. It was agreed that surgery was the best option, but Dr. Gilliam noted that "this will not cure her arthritis and in the future she is likely facing knee replacement surgery."

* On February 12, 2004, Dr. Gilliam operated on Campbell's right knee.  Dr. Gilliam addressed the meniscus tear and

-17-

loose bodies, but noted that there was "bone-on-bone posttraumatic osteoarthritis of the lateral compartment."

* On February 23, 2004, Dr. Gilliam saw Campbell for a recheck following her knee surgery.  The knee was doing well, and had full range of motion, but Dr. Mitchell noted that there was "bone-on-bone" in the medial compartment. Campbell also had trochanteric bursitis, and complained of "lateral hip pain and difficulty sleeping on the right side at night."  She was to return to Dr. Gilliam for recheck in six weeks.

* On March 7, 2004, Campbell completed a Disability Supplemental Interview Outline. She indicated that she did not do any of the activities listed in the previous Outline except shop for groceries, drive, watch television and listen to the radio.  She used a cane and it helped her function better. She was fatigued, and needed a two-hour nap daily.  She had pain "all the time" in her neck, left shoulder, down both arms, in her lower back, right hip and knee;  her hands "tingle all the time."  Her medications were the same.

* On March 10, 2004, Dr. Dan Donahue completed a Psychiatric Review Technique, indicating that Campbell suffered from "depressive syndrome." Dr. Donahue did not indicate the symptoms which were felt to justify this

-18-

diagnosis.   The diagnosis was said to pose a mild limitation on Campbell's activities of daily living, and a moderate limitation on maintaining concentration, persistence, or pace.  In a Mental Residual Functional Capacity Assessment completed that same day, Dr. Donahue indicated that Campbell was moderately impaired in the following categories: ability to understand, remember, and carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to complete a normal workday and workweek without interruptions from psychological symptoms; ability to perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public; and ability to set realistic goals or make plans independently.   He indicated that she "is able to perform work where interpersonal contact is routine but superficial, e.g. grocery checker; complexity of tasks is learned by experience, several variables, uses judgment with limits; supervision required is little for routine but detailed for non-routine."

\* On March 12, 2004, Campbell saw Dr. Mitchell for medication refills.  She told him that she had been doing "relatively well."  Her blood pressure was 140/88.  Dr.

Mitchell refilled prescriptions for Darvocet, Paxil, Relafen[17], Benicar, and Ambien.

*   On April 6, 2004, Campbell saw Dr. Fine.  Her blood pressure was 124/78, then 124/76 on recheck.

*   On May 17, 2004, Campbell saw Dr. Lee.  Her blood pressure was 140/80, and Dr. Lee noted that "her blood pressure remains relatively well controlled."

*   On June 28, 2004, Campbell saw Dr. Mitchell for a checkup.  She told him that she was "doing much better since she has retired." Her blood pressure at that visit was 130/80.  Dr. Mitchell refilled her prescriptions for Darvocet, Paxil, Relafen, Benicar, and Ambien.

*   On July 1, 2004, Campbell saw Dr. Fine.  Her blood pressure was 140/82, then 126/86 on recheck.

*   On September 16, 2004, Campbell saw Dr. Mitchell for conjunctivitis.  Her blood pressure was recorded as 130/82 at that visit.  In addition to medication for the conjunctivitis, Dr. Mitchell refilled Campbell's prescriptions for Darvocet, Synthroid, and Paxil.

*   On October 19, 2004, Campbell saw Dr. Mitchell for a flu shot.  Her blood pressure that day was recorded as 120/92.

*   On November 16, 2004, Campbell saw Dr. Lee.  He reported

---

[17]A non-steroidal anti-inflammatory used in the treatment of arthritis. Physicians' Desk Reference, 1995 Ed.

that following "an episode of hypertension," she "now has
her blood pressures under control."

*   On December 23, 2004, Campbell was involved in an
    automobile accident.  Hospital records describe her
    injuries as "multi system trauma," but she did not suffer
    life-threatening injuries.

*   On January 3, 2005, Campbell saw Dr. Mitchell for follow-
    up from the accident.  Her blood pressure was 140/90, and
    she had back and shoulder pain, along with multiple
    bruises.  Dr. Mitchell reassured Campbell that she was
    healing.

*   On February 4, 2005, Campbell saw Dr. Fine.  Her blood
    pressure was 160/100, and then 150/74 on recheck.

*   On February 14, 2005, Campbell had an MRI of the left
    knee and left shoulder.  The knee showed a meniscus tear,
    small cyst, and degenerative arthritis with joint space
    narrowing and osteophyte formation;  the shoulder
    findings were "most consistent with tendinosis and/or
    bursitis."

*   On February 17, 2005, Campbell saw Dr. Gilliam about her
    left knee and left shoulder, and it was agreed that
    Campbell would undergo arthroscopy of the left knee with
    partial meniscectomy.  He injected her shoulder with
    triamcinolone, Lidocaine, and Marcaine.

\*    On March 10, 2005, Dr. Gilliam performed the left knee surgery.

\*    On March 11, 2005, Dr. Mitchell filled out another Medical Source Statement of Ability to Do Work-Related Activities (Physical). He indicated that Campbell could sit, stand, or walk for less than 15 minutes before having to change her posture, and could sit, stand or walk for less than one hour, separately or combined, in an 8-hour workday. She could lift or carry five pounds occasionally, but never more than that. He stated that these conclusions were supported by her MRI results, elevated blood pressure, chronic pain and muscle spasms requiring monthly visits, and specialist evaluation. She could use her hands for simple grasping and fine manipulation, but not for pushing or pulling, and could not use her feet for repetitive movements such as operating foot controls. She could occasionally bend, climb, reach above her head, and stoop, but never squat, crawl, crouch or kneel. Objective signs of pain were listed as redness, joint deformity, muscle spasm, and "other," described as "[p]atient has trouble walking when she rises from sitting position. Patient has been involved in an auto accident 12/04 that will require surgery." Dr. Mitchell described Campbell's pain as

-22-

"moderate," and stated that she would sometimes need unscheduled breaks in an 8-hour shift, would be likely to have "good days" and "bad days," and could be expected to miss more than four days of work each month.

* On March 17, 2005, Campbell had an MRI of her right knee (showing multicompartment degenerative arthropathy); cervical spine (showing generalized disc bulging at C4-5 and C6-7); and lumbar spine (showing advanced intervertebral disc degeneration at L-4-5 and minimal generalized annular bulging at L-3-4).

* On March 31, 2005, in Claimant's Statement When Request For Hearing Is Filed, Campbell listed her previous medications, along with Levothyroxin[18] for high blood pressure, Cyclobenzapine[19] for pain, Paroxetine[20] for nerves, Bextra for arthritis, Tylenol as needed, Clonozepam[21] as needed, Oxycodone[22] for pain, and Pentazol Noloxone for pain.  In the hearing before the ALJ held

---

[18]This actually appears to be a thyroid replacement agent, with side effects that include fatigue, nervousness, anxiety, irritability, emotional lability, and muscle weakness.  Physicians' Desk Reference, 2007 Ed.

[19]A constituent of Flexeril, with side effects that include drowsiness, weakness, depression, and anxiety.  Physicians' Desk Reference, 1995 Ed.

[20]A constituent of Paxil.  Side effects include somnolence, nervousness, muscle pain, anxiety, and burning or pricking sensations.  Physicians' Desk Reference, 2007 Ed.

[21]The active ingredient in Klonopin, used to treat panic disorder, with side effects that include somnolence, depression, and nervousness.  Physicians' Desk Reference, 2007 Ed.

[22]An opiod analgesic used for management of moderate to severe pain.  Physicians' Desk Reference, 2007 Ed.

this date, Campbell testified that she was 46 years old, and had worked for the State Revenue Department for over 26 years, being just a few years short of retirement. She had been having wide fluctuations in her blood pressure, and on May 30, 2003, her doctor recorded it as "extremely high" in spite of the fact that she was taking "up to nine pills a day" for it. She related her multiple joint problems to misalignment over the years to compensate for knee injuries in her youth, and testified that she could not stand or sit for any length of time due to pain in her right knee, which needed to be replaced. She obtained relief only by sitting propped on pillows in a recliner, and even slept there. She drank her coffee out of a plastic mug because she had problems with dropping things she tried to pick up. A neighbor came in to help with the housework. She did not cook. She wore slip-on shoes and avoided clothes that button. She kept her hair short because of difficulty in caring for it. Her medications - particularly Clonidine - made her extremely sleepy. She had quit driving because she was "so groggy most of the time," and felt her judgment was seriously impaired. She had gained 70 pounds in the past four years. She did not socialize, and felt worthless and hopeless. She

-24-

described the pain in her leg as like an abscessed tooth, or a bone sticking through her hip.

* On July 14, 2005, Dr. Roshan Sharma examined Campbell at the request of the Social Security Administration. Campbell gave Dr. Sharma a brief history of her head, neck, shoulder, back, hip and knee problems, and told Dr. Shama that her blood pressure was "uncontrolled because of pain." She also reported "a lot of nervousness, anxiety, tension, irritability, anger and fatigue." Dr. Sharma recorded Campbell's blood pressure as 130/82, and noted that she had reduced range of motion in her cervical and lumbar spine, both knees and both hips. In Dr. Sharma's opinion, Campbell was capable of lifting and carrying 10 pounds frequently, and of standing or walking about six hours in an 8-hour workday. Dr. Sharma did not find any impairment in Campbell's ability to sit or perform pushing or pulling motions. She could occasionally climb, balance and stoop, but never kneel, crouch, or crawl, and was limited from being around machinery and heights, but had no other limitations.

* On September 16, 2005, the ALJ rendered an unfavorable decision on Campbell's claim.

4. From the foregoing review of the administrative record, the Court concludes that the ALJ erred in discrediting Dr.

-25-

Mitchell's opinion.  He did so, according to the written report of decision, because that opinion "contrasts sharply with the other evidence of record" and appeared to be based on taking "the claimant's subjective allegations at face value."  The Court does not find substantial evidence to support these conclusions.

Dr. Mitchell was Campbell's treating physician, and as such, his medical opinion should be given controlling weight if it is not inconsistent with other substantial evidence in the record, and is supported by medically acceptable laboratory and diagnostic techniques.  **Hacker v. Barnhart, 459 F.3d 934 (8th Cir. 2006).**

Dr. Mitchell's medical opinion about Campbell's ability to sit, stand, walk, push and pull is supported by the objective evidence found in MRIs showing Campbell to have generalized disc bulging at C4-5 and C6-7; advanced intervertebral disc degeneration at L4-5; minimal generalized annular bulging at L3-4; and bone-on-bone arthritis of her right knee.  It is also supported by his own observation of her joint deformity and redness, his referrals of Campbell to specialists for treatment of her joint problems, and his prescription over a period of years of multiple medications for arthritis and pain.  The change in Dr. Mitchell's opinion about Campbell's functional capacity that can be seen between his RFC of December 5, 2003, and the one dated March 11, 2005, is supported by the degenerative nature of joint disease and by what Campbell herself described as "massive" weight

gain.

The only evidence that contradicts Dr. Mitchell's opinion comes from the consultative physicians for the Social Security Administration, Dr. Michael Young, Dr. Steve Owens, and Dr. Roshan Sharma.   When considered with the evidence as a whole, these opinions do not constitute substantial evidence that would support the ALJ's decision to discredit the testimony of Dr. Mitchell.

Dr. Michael Young, when asked about Campbell's limitations and their severity, offered nothing more enlightening than the information that Campbell could dress herself and get on and off the examination table without assistance.

Dr. Steve Owens completed an RFC finding Campbell could sit, stand or walk for six hours in an 8-hour workday, and push and pull without limitation, but did so without benefit of an examination or a medical source statement.

Dr. Roshan Sharma did examine Campbell and her medical records, but her report suggests that she did not seriously consider the overall picture of Campbell's health, including the effect of her joint disease, her medications, and her obesity. Dr. Sharma observed abnormalities in Cambpell's cervical, lumbar, hip and knee ranges of motion, but evaluated those abnormalities as not being particularly limiting.  She reviewed the MRI showing generalized disc bulging at C4-5 and C6-7, but dismissed it as "[d]oes not show anything significant."  She noted the MRI showing

-27-

advanced intervertebral disc degeneration at L4-5 and minimal generalized annular bulging at L3-4, and bone-on-bone arthritis of the right knee, but did not consider these conditions to limit the functionality of an individual weighing, at the time, 263 pounds. She "reassured" Campbell that her blood pressure was under control, but did not consider the side effects of the medication regimen required to keep it that way. She noted that Campbell had a driver's license, but did not note that Campbell was too groggy from blood pressure pills to use it.

In addition, nothing in the reports of Drs. Young, Owens, or Sharma contradicts Dr. Mitchell's opinion that Campbell would need to take unscheduled breaks, and would be expected to miss more than four days' work a month because of her impairments, and Dr. Mitchell's opinion on these aspects of Campbell's condition is supported by the objective medical evidence of her joint condition and her medication regimen.

It is axiomatic that "[t]he ALJ should give more weight to the opinion of doctors who have treated a claimant regularly over a period of months or years because they have a 'longitudinal picture of [the] impairment'." **Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004).** As provided in **20 C.F.R. §416.927(d)(2)(i),** "the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When

the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source."  In this case, Campbell testified that Dr. Mitchell had been her family doctor since 1997, and the medical records available to the ALJ indicated that between January 4, 2002, and the date of the administrative hearing, March 31, 2005, Dr. Mitchell saw Campbell 29 times.

While a treating physician's opinion does not automatically control, it should be discounted only where other medical opinions are supported by better or more thorough medical evidence, or the opinion of the treating physician is inconsistent.  **Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005)**.  That is not the case here.  Indeed, the ALJ "acknowledge[d] that greater weight should be placed on Dr. Mitchell's observations of the claimant, by reason of his position as the claimant's treating physician," but then went on to say "in this case, I place greater weight on the consultative examination by Dr. Sharma."  He suggests no reason why the opinion of Dr. Sharma, who saw Campbell only one time, is more credible than that of Dr. Mitchell, whose records present a truly longitudinal picture of treatment for intractable hypertension and multiple joint disorders, for which appropriate medications were prescribed, and for which Dr. Mitchell referred Campbell to specialists who also monitored and treated her various

-29-

condition.

The Court is particularly concerned about the ALJ's comment, at page 342 of the administrative record, wherein he stated - about a blood pressure reading of 152/92 - "[t]hat don't sound to me like it's too awfully bad." For a person who was at the time of the reading taking multiple medications to lower her blood pressure, the reading *is* "awfully bad." A basic medical reference, **Stedman's Medical Dictionary**, **28th Ed.**, defines hypertension as:

> High blood pressure; transitory or sustained elevation of systemic arterial blood pressure to a level likely to induce cardiovascular damage or other adverse consequences. H[ypertension] has been arbitrarily defined as a systolic blood pressure above 140 mmHg or a diastolic blood pressure above 90 mmHg. Consequences of uncontrolled h[ypertension] include retinal damage . . . cerebrovascular disease and stroke, left ventricular hypertrophy and failure, myocardial infarction, dissecting aneurysm, and renovascular disease. . . . h[ypertension] is recognized as a major cause of diseases and death in industrialized societies.

Campbell's problems with getting and keeping her blood pressure under control are objectively documented by the many office visits with blood pressure checks in the dangerous range. Those visits also reflect that it was only after Campbell stopped working that her blood pressure medications began to successfully control her hypertension. This coincidence calls for further medical investigation to determine if there is a correlation between stress, pain, and elevated blood pressure in Campbell's case.

5.   The Court finds that the ALJ also erred in discrediting

Campbell on the stated basis that the objective medical evidence and her daily activities were not consistent with the level of pain she alleged.  Specifically, the Court believes the ALJ's conclusion that "the medical findings that are present are not consistent with the disabling level of pain alleged by the claimant" is not supported by substantial evidence in the record as a whole.  The medical findings of bulging intervertebral discs at C4-5, C6-7, L3-4, and L4-5, and bone-on-bone arthritis of the right knee may well be consistent with complaints of disabling levels of pain, particularly when coupled with excessive weight.

The ALJ's conclusion that Campbell's testimony about her daily activities is inconsistent with her testimony about level of pain is not supported by substantial evidence.  The administrative record contains three "snapshots" in which Campbell described her daily activities, and they show an evolving picture of disabling pain.

The first snapshot is in the undated Disability Supplemental Interview Outline which the Court believes to have been filled out around the time Campbell applied for benefits in July, 2003.  There, Campbell indicated that she could do laundry and wash dishes, change sheets, vacuum and sweep, shop for groceries and clothes, prepare meals, drive, watch television and listen to the radio, but could not walk for errands or exercise, or sit or stand for any period of time, and that her hands and arms stayed numb

from working on the computers (apparently at her workplace).  She said that she had constant pain in her lower back, right hip and leg, left shoulder, neck and both arms.  She took multiple medications for arthritis and pain, as well as other conditions.

The second snapshot is of Campbell's condition on March 7, 2004, when she indicated that she could no longer do any of the activities listed in the earlier Disability Supplemental Interview Outline except shop for groceries, drive, watch television, and listen to the radio.  She was using a cane to get around, and described constant pain in her neck, left shoulder, down both arms, in her lower back, right hip, and right knee.  Her hands "tingle[d] all the time."  She took multiple medications for arthritis and pain.

The third snapshot is Campbell's testimony at the hearing before the ALJ on March 31, 2005.  At that time, Campbell testified that she spent most of the day in a recliner with pillows propped under her leg to try to relieve the pain in her right hip and leg; that she would start out the night sleeping in bed but would have to move back to the recliner in a few hours because of pain; that she used a plastic mug to drink out of because she had problems dropping things that she picked up;  that she no longer did any housework, relying on outside help; that she did not cook, do yard work, or wash the car; and that she wore slip-on shoes and clothes without buttons to simplify dressing, and kept her hair short

because of trouble with blow-drying it.

These snapshots of daily activity are consistent with Campbell's allegations of disabling pain, and their gradual progression is consistent with the progressive nature of degenerative joint disease and "massive" weight gain.

Before rejecting a claimant's subjective complaints of pain, the ALJ must demonstrate that he examined all the evidence, making express credibility determinations and setting forth the inconsistencies in the evidence that lead to his conclusion. **Douthit v. Bowen**, **821 F.2d 508 (8th Cir. 1987)**.  There must, of course, be objective medical evidence of an impairment which could reasonably be expected to cause pain - in this case supplied by the MRIs - but as to the severity, the following factors should be considered in evaluating the credibility of claimant's subjective complaints of pain:

*     prior work record;

*     daily activities;

*     duration, frequency and intensity of pain;

*     precipitating and aggravating factors;

*     dosage, effectiveness and side effects of medication; and

*     functional restrictions.

This evidence can come from the claimant, her doctors, or third parties.  The ALJ cannot reject a claimant's subjective

complaints solely on the basis of personal observations, but may discount them if there are inconsistencies in the evidence as a whole.  **Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).**

There is insufficient evidence that the ALJ considered the **Polaski** factors.  There is evidence in the record that Campbell had worked for the same employer for over 26 years, and was very close to retirement when she applied for benefits.  This work history supports her credibility.  **O'Donnell v. Barnhart, 318 F.3d 811, 817 (8th Cir. 2003).**

Campbell's daily activities are consistent with her subjective complaints of pain and of grogginess from medication side effects that prevent her from doing much of anything.  On March 7, 2004, she described her daily activities as being limited to shopping for groceries, driving, watching television, and listening to the radio.  By the time of the hearing, Campbell testified that she spent the greater part of most days and nights propped on pillows in a recliner, and had few activities other than watching television.  This evidence is not inconsistent with Campbell's claim of disability.  "The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work." **Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000).**

Campbell gave graphic descriptions of the duration, frequency, and intensity of her pain.  She reported, in each document filled

-34-

out in connection with her application for benefits, that the pain was constant and that there was little she could do to relieve it. Lying in her recliner with pillows propped under her hip appeared to afford the best relief.  At the hearing, Campbell testified that "I have this bone in my leg that feels like it's sticking through my hip."  She said it felt like an abscessed tooth or "like my leg is broke and it's not set."

Campbell also was consistent throughout the process with regard to what precipitated or aggravated her pain:  sitting, standing, and walking.

With regard to the dosage, effectiveness and side effects of medication, Campbell testified to the usage of Darvocet, Vioxx, Propoxy/Acetominophen, Cyclobenzapine, Bextra, Tylenol, Oxycodone, and Pentazol Naloxone for pain.  She also received periodic injections of painful areas with numbing agents, and used what appears to be a TENS unit on her shoulder.  She was consistent in seeking medical treatment over a period of years in attempts to find relief from her pain.

The functional restrictions to which Campbell gave testimony are reflected in the virtual suspension of all activities.

When the record as a whole is considered, the Court finds that there is not substantial evidence to support the ALJ's decision to discredit Campbell's subjective complaints of pain.

6.   The Court also finds that the ALJ erred in not

considering Campbell's depression, the side effects of Campbell's complex drug regimen, and her obesity on her residual functional capacity.

Dr. Donahue found that Campbell had depression that moderately impairs her ability to pay attention, concentrate, carry out instructions, work a normal workday and workweek, perform at a consistent pace without an unreasonable number of rest periods, interact with the public and set realistic goals.

Several of the medications Campbell takes to control her blood pressure list "somnolence" as a side effect, and Campbell testified that the medications do have that effect on her, often causing her to sleep for several hours at a time.  She testified that she was too "groggy" from the medications to drive.  She also testified that the ups and downs of her blood pressure caused extreme fatigue.

Finally, Campbell is obese, weighing in the range of 260 pounds.  She testified that in the five years preceding the hearing, she had experienced a "massive" weight gain, in the range of 70 pounds.  Obesity is known to complicate both musculoskeletal and cardiovascular conditions.  See **(SSR) 02-01p, 2000 WL 628049 (SSA, Sept. 12, 2002.**

The ALJ did not properly consider these factors, either as isolated factors or with regard to their synergistic effect on Campbell's ability to work.

-36-

7.    When the Court considers all the evidence - not just that which supports the ALJ's decision, but also that which fairly detracts from it - it concludes that there is not the requisite measure of "substantial evidence" to support the decision in this case. The Court, therefore, concludes that the matter should be remanded to the Commissioner for further consideration.  Upon remand, the Court directs that the ALJ obtain appropriate medical opinions on the following questions:

* To what degree do stress and pain contribute to Campbell's hypertension?

* Would working, with its concomitant stress and pain, be likely to affect Campbell's ability to safely control her blood pressure?

* What are the side effects of Campbell's various medications, particularly their tendency to cause somnolence, on her ability to work?

* What is the effect of Campbell's depression, particularly when combined with medication side effects, on her ability to work?

* What is the effect of Campbell's obesity on her ability to work, given her known degenerative joint disease and high blood pressure?

The Court further directs that, if the ALJ is still persuaded that Dr. Mitchell and Campbell are not fully credible, he

specifically state the factors upon which this determination is made.

Accordingly, the Court reverses the decision of the Commissioner, and remands this case to the Commissioner for further consideration pursuant to sentence four of **42 U.S.C. §405(g),** and as directed in this Order.

If plaintiff wishes to request an award of attorney's fees and costs under the Equal Access to Justice Act, an application may be filed up until thirty days after the judgment becomes "not appealable," i.e., thirty days after the sixty-day time for appeal has ended.  **Shalala v. Schaefer**, 509 U.S. 292 (1993); 28 U.S.C. §§ 2412(d)(1)(B) and (d)(2)(G).

**IT IS SO ORDERED.**

       **  /s/Jimm Larry Hendren**
       **JIMM LARRY HENDREN**
       **UNITED STATES DISTRICT JUDGE**